# UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB 1 3 2018

UNITED STATES OF AMERICA

v.

KEISHA L. WILLIAMS,

Defendant.

Case No. 1:18-mj-68

**UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Jamie M. Vera, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly

sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint charging KEISHA L.

WILLIAMS (hereinafter "WILLIAMS") with conspiracy to commit wire fraud, in violation of

Title 18, United States Code §1349. This affidavit is also submitted in support of an arrest warrant

for WILLIAMS.

2.      I have been a Special Agent with the FBI since September 2015. I have received

basic law enforcement training at the FBI Academy in Quantico, Virginia. I am currently assigned

to the FBI's Washington Field Office, where I am responsible for conducting and assisting with

securities fraud and investment fraud investigations, including related white-collar and financial

crimes. As such, I have participated in investigations involving mail fraud, wire fraud, securities

fraud, bank fraud, and conspiracy. I have also received additional training in the area of white-

collar crimes. Prior to my employment with the FBI, I worked for approximately four years in

accounting and finance related roles.  I am a Certified Public Accountant and a Certified Fraud

Examiner.

3.      This affidavit is intended to show merely that there is sufficient probable cause for

the requested complaint and arrest warrant, and does not set forth all of my knowledge about this

matter.  The facts and information contained in this affidavit are based on my personal knowledge

and information obtained from legal process or from other law enforcement officers.  All

observations referenced in this affidavit that were not personally made by me were relayed to me

by the person(s) who made such observations or in reports that detailed the events described by that

person.

PROBABLE CAUSE

## I.      Background on the Fraud Scheme

4.      WILLIAMS and an individual named Christian D'Andrade (hereinafter

"D'Andrade"), have been soliciting loans from various investors, including family and friends, for

the alleged purpose of paying fees to obtain a health care-related software called "Zydacron"

located overseas in Austria.  To date, they have raised approximately $5 million from investors.

WILLIAMS and D'Andrade are telling investors that their money will be used to get this software

out of "escrow," and that their loans will be quickly repaid with interest rates from 30% to as high

as 100%.  To my knowledge, none of the investors have been paid back.

5.      While some of the funds—approximately $272,000—went to an Austrian attorney

and a court-appointed receiver in Austria, and do appear to be related to the purchase of the

software, the remainder of the approximately $5 million raised from investors was spent on

personal use.  For example, WILLIAMS spent approximately $1,000,000 in travel expenses to

places such as Brazil, Prague, Puerto Rico, Tahiti, and Thailand, including approximately

$150,000 for hotels located in the Washington, D.C. metropolitan area, where WILLIAMS

2

actually resides.  To take another example, WILLIAMS spent nearly $1,000,000 on shopping, restaurant, and vehicle-related expenses, including luxury stores such as Chanel, Gucci, and Louis Vuitton.

6.      WILLIAMS does not appear to have any legitimate source of business revenue, as the only incoming money to her bank accounts appears to be from investors. WILLIAMS appears to be the primary financial beneficiary of the scheme.

**II.    Investor S.J.S.**

7.      S.J.S. is a 71-year-old woman who resides in McLean, Virginia.  In approximately 2010, S.J.S. began working for CBX Technologies, Inc., D'Andrade's company.  S.J.S. was diagnosed with cancer and had to stop working for D'Andrade in approximately December 2013, but S.J.S. and D'Andrade remained in contact.

8.      S.J.S. told the FBI the following: In March 2015, S.J.S.'s father passed away and left her an inheritance of approximately $250,000.  Around May 2015, just two months after S.J.S.'s father passed away, D'Andrade began asking S.J.S. for money.  D'Andrade told S.J.S. that he and WILLIAMS needed a short-term loan to pay some additional fees to acquire medical software, which was being held by a company in Austria.  D'Andrade told S.J.S. he would pay back the loan in full, plus 30% interest.

9.      A review of bank records shows that on May 18, 2015, and May 19, 2015, S.J.S. wired D'Andrade $55,000 and $40,000, respectively.  The memo section of the $55,000 wire referenced "1st part loan to Christian D Andrade" and the $40,000 wire referenced "Loan to Christian D Andrade for software project." These are the first known loans provided by S.J.S. for the "software project."

10.     Over the next year, D'Andrade kept going back to S.J.S. to ask for more and more money to pay additional fees, telling her that the money was needed urgently to get the software

out of "escrow" in Austria, threatening that all would be lost if he did not get the money, and

promising her that a return on her loans was imminent.  S.J.S. also had a few telephone

conversations and exchanged a few text messages with WILLIAMS.  S.J.S. ultimately loaned

D'Andrade and WILLIAMS a total of what she believed to be approximately $375,000 that was

supposed to be used towards paying fees related to the software project.  A review of bank records

has identified loans of approximately $296,000 from S.J.S.

11.      S.J.S. consented to a search of the Motorola cellular phone that she used to

exchange these calls and text messages with WILLIAMS and D'Andrade.  Some of these text

messages and phone calls are discussed below.

12.      On November 24, 2015, S.J.S. sent WILLIAMS a text message regarding an

investor who was allegedly in town to meet with WILLIAMS.  WILLIAMS responded to this text

message on November 27, 2015, stating that she met with the investor and would be meeting with

him again because they were still short "a few fees."  The following is the text message exchange

between S.J.S. and WILLIAMS:

> S.J.S.               Chris mentioned that the investor is in town. I am praying
>                      that u have gr8 meetings with him & am praying extra hard
>                      that Chris obtains his funds today!! I sincerely hope & pray
>                      that today is the DAY!!! BLESSINGS TO U!!! [J.]
>
> WILLIAMS             Hey [J.], hope is well! I apologize for the delay in response.
>                      The investor was in town, he and I will be meeting again on
>                      Monday as we are still short a few fees. But I'm working to
>                      assist with coming up with the fees to close this! My #1
>                      priority is to close this transaction, get you guys paid and
>                      move forward. Stay patient just a little while longer, I know
>                      God will see this through!

13.      On October 7, 2017, D'Andrade sent S.J.S. a text message, which stated that he

needed to find $47,000 by the morning or they were going to lose the software. Later that same

day, S.J.S. consensually recorded a phone conversation with D'Andrade. The following is a

transcribed excerpt from the phone conversation:[1]

| | |
|---|---|
| D'Andrade | Ok now I was just getting ready to call you so don't tell me you, I was going to call you back. |
| S.J.S. | Never mind, never mind it's alright I'm just, my health isn't good and I fell yesterday and I-I, things just aren't good and you have all my retirement money so may not be able to even have any problems |
| D'Andrade | I-I think we will be okay |
| S.J.S. | Well |
| D'Andrade | I think we will |
| S.J.S. | That's what you been saying for two years oh Chris |
| D'Andrade | I know |
| S.J.S. | And I wonder, where is it now? I mean why did you need hundred and forty seven yesterday and you need forty seven today and I don't understand it |
| S.J.S. | Because, yeah, because we needed to pay some additional fees in Europe, that's why we needed it. We haven't got the money from Bank of America. You have to pay the Europe and all the fees so they charged us more fees until we got the money released, so that's why |
| S.J.S. | [Beep Noise] oops okay may I ask who's telling you this |
| D'Andrade | mmmm |
| S.J.S. | Is that okay, may I ask who's telling you this. Who do you get these instructions from? |
| D'Andrade | I can send you emails from our lawyer in Europe. I can send you some text messages so you can see |
| S.J.S. | Would you please Chris, because I mean, because |

---

[1] All consensually recorded telephone conversations and in-person meetings were transcribed by an employee of the FBI.

|  | [T.P.] is now |
| --- | --- |
| D'Andrade | I'll forward you Yeah I am going to forward you a letter that we got from August uhhm from the E-U. So you can see I am not trying to bullshit |

## III.   Investor T.P.

14.     On August 23, 2015, D'Andrade sent a text message to S.J.S. asking her if T.P. could loan him money for the "software project." T.P. is a 70-year-old man who resides in Silver Spring, Maryland, and is friends with S.J.S. T.P. told the FBI the following: D'Andrade told T.P. about a "megabucks" investment opportunity to buy expensive software related to healthcare. T.P. never met WILLIAMS in person, but they had a telephone conversation, which was confirmed through toll records.

15.     A review of bank records shows that T.P. loaned WILLIAMS $70,000 in the form of three wires for the following amounts: $30,000 on July 30, 2015, $20,000 on August 24, 2015, and $20,000 on October 26, 2015.

16.     T.P. still has not received repayment on his loan of $70,000.

## IV.   Investor T.D.

17.     T.D. is a 73-year-old man who resides in Northern California. T.D. provided the FBI with the following information: T.D. heard about an opportunity to invest in a software project from S.J.S. T.D. had a telephone conversation with D'Andrade, who explained that he needed $30,000 to pay the remaining balance to acquire a medical software, which was being held by a European company. Also on the phone with D'Andrade was WILLIAMS, who was represented as an attorney. D'Andrade agreed to pay T.D. back within one week, plus 20% interest, as well as accrued late fees for every day the loan was not repaid. T.D. required D'Andrade to sign a promissory note in exchange for the loan, which D'Andrade did.

18.     An analysis of subpoenaed toll records shows that on October 28, 2015,

WILLIAMS called D'Andrade and then conference-called T.D., so that all three of them were on

the phone at the same time for a 32-minute phone conversation.

19.     A review of bank records shows that on October 29, 2015, WILLIAMS' Citibank

account received a wire of $30,000 from T.D.

20.     T.D. still has not received repayment on his loan of $30,000.

**V.     Introduction of an Undercover Employee**

21.     In September 2017, S.J.S. told D'Andrade that her friend D. knew of an individual

named "Harry" who had a lot of money and might be interested in investing.  Harry was actually an

undercover FBI employee (hereinafter "the UCE").  S.J.S. provided D'Andrade with the UCE's

phone number.

22.     On September 19, 2017, the UCE and D'Andrade had their first telephone

conversation.  D'Andrade asked the UCE for a bridge loan of $300,000 within the first two

minutes of the conversation.  When the UCE started to ask for more specific details, D'Andrade

suggested getting his "partner" WILLIAMS on the line.  The following is an excerpt of the

telephone conversation between the UCE and D'Andrade:

> D'Andrade          We have uhh, we are invested in some software and we
>                    have some fees that we got to get paid in Europe and
>                    we are looking for a short, we have some money
>                    coming in, we are looking for some short uhhh really a
>                    bridge loan to see if we can get his thing done before
>                    they sell our damn software in Europe or we go crazy.
>                    Right now we need about 300k, and I don't know where
>                    you stand with that, in terms of what you require for a
>                    post collateral or what kind of stuff maybe.
>
> UCE                . . . So you are saying that you invested in software that
>                    can be sold in Europe and requires some fees and you
>                    need approximately 300K Bridge loan is that accurate.

7

| D'Andrade | Yeah, let me see if I can get my partner on this line so that the three of us can have a conversation. |

23.    Shortly after hanging up, D'Andrade called the UCE back with WILLIAMS on the line. The following is an excerpt of the conversation between D'Andrade, WILLIAMS, and the UCE:

| WILLIAMS | What we need, we need immediately, we acquired the company, we spent our own cash on it, Chris and I together and we have it here in escrow with our attorney, we have some outstanding tax liabilities with this. We were looking for a bridge loan so that when we get the software back to the U.S. we already have several companies that want to give us loans in order to transfer to the platform. |
| UCE | …So Keisha, you and Chris are you guys investors or are you guys with management, executive managers, is it Oxyia, you said that was the entity here. |
| WILLIAMS | We are actually the, 100 or sole owners of the organization. We use our [phone beep] and we invest in the company and we bought it and we used our own money. We have our chief architect, who is a health care guru, he has been in the business for thirty years and he is the one that worked with myself and Chris on a taking the existing platform that we had and kind of moving to the next level as to what we are actually going to utilize in the U.S. uhhm we are not only doing business in the U.S. we also have countries like the Dubai health agency uhhm Singapore uuhm we have existing clients in India. |

## VI.   Evidence Pertaining to the Zydacron Software

24.    On September 19, 2017, shortly after this phone call, WILLIAMS emailed the UCE a document from the Austrian attorney who was representing her in connection with the Zydacron software purchase. This document, which was dated October 9, 2017, stated on its face that it "may be handed over to third parties," and that "[t]he authenticity of this electronic document may be checked by contacting us by phone or telefax during our office hours."

25.     The document states that the remaining debt associated with the purchase of the Zydacron software is approximately 1,022,600 euros, which is approximately $1,250,680. This total is composed of the following components: the balance on the software purchase price is approximately 735,840 euros (the equivalent of approximately $900,583); the total accrued interest is approximately 200,822 euros (the equivalent of $245,783); and the total legal fees and related attorney fees approximately 85,836 euros (the equivalent of approximately $105,049). I later spoke with the attorney who prepared the document, who verified that these numbers are accurate and correct. The attorney further stated that there is no outstanding tax liability on the software.

26.     WILLIAMS purchased the Zydacron software on October 1, 2014. Since that time, she has paid a total of approximately $272,000 towards the outstanding liabilities related to the software. Nevertheless, since at least October 2014 to the present, WILLIAMS and D'Andrade have raised approximately $5 million from investors by telling them that the money was needed to pay legal fees and taxes to get the Zydacron software "out of escrow."

## CONCLUSION

27.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from at least in or about October 2014 to the date of this affidavit, WILLIAMS conspired to engage in a scheme to defraud, utilizing interstate wires in the execution of that scheme, in violation of Title 18, United States Code §1349. This conspiracy took place in part within the Eastern District of Virginia, including at least one overt act in the form of an interstate wire in furtherance of the scheme.

Respectfully submitted,

Jamie M. Vera
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February **13**, 2018

_____ /s/ _____ **JFA**

John F. Anderson
United States Magistrate Judge

The Honorable John F. Anderson
United States Magistrate Judge